IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LACEY SHALLEEN LAUDENSLAGER, | ) | Case No. 3:22-CV-02315 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Lacey Shalleen Laudenslager, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Laudenslager challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ erred in: (i) failing to find that her fibromyalgia and psychological disorders constituted severe impairments; (ii) evaluating the opinion of physician assistant Candice Devol; (iii) evaluating Laudenslager's subjective symptom complaints; and (iv) finding that she could perform her past work and other available work at the light exertional level.  Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Laudenslager's application for DIB be affirmed.

**I.    Procedural History**

Laudenslager applied for DIB on October 22, 2020.  (Tr. 188-189).  She alleged that she became disabled on September 1, 2020, due to rheumatoid arthritis, fibromyalgia, and psoriatic

arthritis.  (Tr. 201, 205).  The Social Security Administration denied her claim initially and upon

reconsideration.  (Tr. 75-82, 84-91).  Laudenslager requested an administrative hearing.

(Tr. 116-117).

ALJ Patricia Carey conducted a telephonic hearing on November 18, 2021 and denied

Laudenslager's application in a December 1, 2021 decision.  (Tr. 15-33, 40-74).  In doing so, the

ALJ found that Laudenslager could perform light work except that:

> [Laudenslager] can frequently climb ramps and stairs, never climb ladders, ropes,
> or scaffolds.  She can never kneel or crawl.  She is to avoid all exposure to
> unprotected heights and dangerous machinery.  She can frequently handle, finger,
> and feel with her bilateral upper extremities.  She is limited to occasionally driving.
> She is limited to occasional foot controls.

(Tr. 22).  The Appeals Council declined further review, rendering the ALJ's decision the final

decision of the Commissioner.  (Tr. 1-3).  On December 24, 2022, Laudenslager filed a

complaint seeking judicial review.  ECF Doc. 1.[1]

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Laudenslager was born on August 7, 1989 and was 31 years old on the alleged onset date.

(Tr. 201).  She completed college in 2011 and received special training in criminal justice.

(Tr. 206).  She had previously worked as a gas station attendant, corrections officer, receptionist,

social services specialist, and for the humane society.  *Id.*

### B.    Relevant Medical Evidence

On April 21, 2020, Laudenslager underwent an MRI of her right hand for joint pain; it

was unremarkable save for a notation that there was minimal fluid at her first, second, and third

metacarpophalangeal joints.  (Tr. 432).

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

On September 2, 2020, Laudenslager saw James Davidson, M.D., for orthopedic treatment.  (Tr. 297, 299).  Laudenslager reported having had anterior left knee pain for 2 to 3 weeks with intermittent swelling.  (Tr. 297).  Dr. Davidson noted that Laudenslager had previously been diagnosed with rheumatoid arthritis and took Plaquenil.  *Id.*  A review of her systems was unremarkable.  *Id.*  On physical examination, Dr. Davidson noted tenderness at Laudenslager's patella femoral joint, and an antalgic gait.  (Tr. 298).  Dr. Davidson provided Laudenslager with an injection into her left knee.  *Id.*  Laudenslager also underwent x-rays of her knees, which were unremarkable.  (Tr. 299).

On September 22, 2020, Laudenslager saw physician assistant Candice Devol at Columbus Arthritis Center, regarding joint pain.  (Tr. 263-267).  Laudenslager reported having pain and swelling in her right hand, and indicated that a prior injection in her left knee had helped reduce her pain and swelling, although her decreased range of motion and pain persisted.  (Tr. 265).  She noted that she was doing better, until she started having 16+ hour work shifts, which caused her symptoms to flare up regularly, but she had switched to an at-home position.  *Id.*  Devol assessed Laudenslager with joint pain, fibromyalgia, and psoriasis, as well as other conditions for which Laudenslager was being treated by other physicians.  (Tr. 263-264).

As to her joint pain, Devol noted that Laudenslager reported improvement with Plaquenil, particularly with her back pain, but she still reported stiffness.  (Tr. 263).  Devol ordered updated lab work, continued the Plaquenil prescription, and provided information on other medications.  *Id.*  As to her fibromyalgia, Laudenslager reported having had a flare up in August 2020; she said she had sporadic deep bone pain, palpitations, and chest pain while resting; and occasionally had swelling in her left big toe.  *Id.*  Laudenslager also reported numbness and tingling in her fingers, which caused her to sometimes drop things.  *Id.*  Devol noted that Laudenslager also became a

foster parent in August 2020, which caused exhaustion, and her fatigue was worse during flare-ups. *Id.*

On September 23, 2020, Laudenslager saw Dr. Davidson, regarding her left knee patellar chondromalacia. (Tr. 294).[2] Laudenslager reported an 80% improvement but stated that she had a loss in her range of motion. *Id.* A review of her systems was unremarkable. (Tr. 294-295). Dr. Davidson assessed Laudenslager with rheumatoid arthritis and chondromalacia of the left patella. (Tr. 295). As to her patella, Laudenslager reported that she felt her symptoms were well controlled and she was working with her arthritis specialist to gain better control with her medications. *Id.*

On November 10, 2020, Laudenslager saw Devol, and reported that she had started methotrexate ("MTX"), which provided more good days than bad days, although she had fatigue and nausea after some doses. (Tr. 258, 260, 262). She reported having moderate but improving pain in her joints, rating it 7/10. (Tr. 260). A review of her systems was unremarkable, and Devol maintained her assessments. (Tr. 258-259). As to Laudenslager's joint pain and fibromyalgia, Devol continued Laudenslager's medication. *Id.* Devol also noted that Laudenslager did not note having a psoriasis breakout at the time. (Tr. 259).

On November 23, 2020, Laudenslager saw Angela Ray, M.D., regarding her diabetes. (Tr. 286). Laudenslager did not report any problems with her diabetes since her last appointment. *Id.* A review of her systems was unremarkable, as were the observations on physical examination, except for Dr. Ray's notation that she was sensitive to light touch in her extremities. (Tr. 288-289). Dr. Ray ordered lab work and continued Laudenslager's medication. (Tr. 289).

---

[2] Although the note does note does not identify Dr. Davidson as the author, the ALJ cited these records as being from him and neither party has disputed that attribution. (*See* Tr. 26).

On December 3, 2020, Laudenslager saw Michael Cairns, M.D., regarding a rash, a wart on her left thumb, and a toenail issue.  (Tr. 281-284).  A review of her systems was unremarkable, and, on physical examination, Dr. Cairns noted that Laudenslager lost the toenails on her great toes and had a papule on her left thumb.  (Tr. 283).  He recommended treatment for each.  *Id*.

On December 17, 2020, Laudenslager saw Devol, reporting continued improvement with MTX and that, overall, she felt she could do more.  (Tr. 353-357).  She reported that when she had pain, however, it was worse, and she would have lower back pain.  (Tr. 355).  She also noted that Cymbalta helped with her fibromyalgia and her depression symptoms were worse.  *Id.*  Devol's assessments remained the same and she adjusted or continued Laudenslager's medications.  (Tr. 353-354).

On December 30, 2020, Laudenslager saw Dr. Cairns regarding her rash, nails, and wart.  (Tr. 400).  On examination, Dr. Cairns noted that Laudenslager's rash was doing well, toenails had some regrowth, and her wart remained.  (Tr. 402).  He gave her an injection for the wart.  *Id.*  A few months later, Laudenslager received another injection for the wart.  (Tr. 399).

On February 4, 2021, Laudenslager saw Dr. Ray.  (Tr. 394).  A review of her systems was positive for fatigue and memory and concentration difficulties, and Dr. Ray's physical examination observations were unremarkable.  (Tr. 396).  Laudenslager was assessed with difficulty concentrating and referred to a doctor specifically for evaluation.  *Id.*

On February 12, 2021, Laudenslager saw Devol, and reported that she seemed to be improving with the injectable MTX and her quality of life had improved.  (Tr. 348-352).  She was told however, by a chiropractor that her back was inflamed, and she had knee, back, and hip pain and psoriasis on her knee and scalp.  (Tr. 350).  As to her joint pain, Laudenslager noted

5

that Naproxen did not seem to be helping, and Etodolac seemed more effective.  (Tr. 348).

Devol maintained her assessments.  (Tr. 348-349).  Devol adjusted Laudenslager's medication

and discussed topical treatments, stretching, and yoga for her lower back.  *Id.*  Devol continued

Laudenslager's medication for her fibromyalgia.  (Tr. 349).

On February 26, 2021, Laudenslager saw Marc Antonchak, M.D., with the Columbus

Arthritis Center.  (Tr. 343-347)  She reported that the higher dose of MTX appeared to be

helping and expressed concerns over weight gain.  (Tr. 345).  Dr. Antonchak assessed her with

"likely" psoriatic arthritis, noting that her back pain seemed to improve with MTX, and altered

her medications.  (Tr. 343).  Dr. Antonchak also assessed her with fibromyalgia and psoriasis,

although he noted she had not been formally diagnosed with psoriasis.  (Tr. 344).  As to her

fibromyalgia, he noted that if her weight gain did not improve she should consider decreasing

Lyrica.  *Id.*

On March 10, 2021, Laudenslager saw Dr. Cairns regarding her thumb and psoriasis.

(Tr. 386).  Laudenslager reported potentially psoriatic arthritis, based on the redness on her right

knee and scaling on her right thumb.  *Id.*  On examination, Dr. Cairns observed that she had mild

xerosis of her right thumb pad with no evidence of a wart, an improved wart on her left lateral

thumb, and mild erythema on her right knee.  (Tr. 388).  Dr. Cairns noted that she may have

dermatitis versus psoriasis on her thumb and knees, and recommended an ointment; he also

provided another injection for the wart.  *Id.*

On March 17, 2021, Laudenslager was seen by Dr. Davidson.  (Tr. 324).  It was noted

that he diagnosed her with chondromalacia of her left patella, but no further treatment notes were

provided.  (*See* Tr. 324-327).

On March 17, 2021, Laudenslager also saw Dr. Ray for continued left knee pain and swelling; she reported that she had stood up and felt a sharp pain in her knee.  (Tr. 383). Laudenslager reported that the pain was intermittent and that she had noticed increased joint pain.  *Id.*  A review of her systems was largely unremarkable.  *Id.*  After examining her knee, Dr. Ray assessed Laudenslager with chondromalacia of the left patella and provided Laudenslager with an injection.  (Tr. 384).

On March 25, 2021, Laudenslager saw Dr. Antonchak.  (Tr. 335-341).  Laudenslager reported having diffuse pain, feeling worse since stopping Plaquenil, and that MTX helped, but her pain and stiffness continued.  (Tr. 338).  She also noted that an injection from Dr. Davidson into her right knee had helped, she currently had psoriasis on her right knee and hand, and she was tapering off Cymbalta.  *Id.*  A review of her systems was positive for fatigue, night sweats, dry mouth, diarrhea, memory difficulty, paresthesia, depression, hair loss, back pain, joint pain, joint swelling, morning stiffness, muscle spasms, and weakness.  (Tr. 340).  On physical examination, Dr. Antonchak observed that Laudenslager was overweight, had tenderness on both hips and her right knee, scattered myofascial tenderness, and tenderness and swelling in her hands and wrists.  (Tr. 341).  Dr. Antonchak maintained his assessments.  (Tr. 335).  He adjusted Laudenslager's psoriatic arthritis medication.  *Id.*  He also noted that her symptoms worsened after discontinuing Plaquenil.  *Id.*  Dr. Antonchak ordered additional lab work, instructed her on increasing her exercise to help improve her fibromyalgia, and instructed her to taper off Cymbalta.  (Tr. 336).  As to Laudenslager's psoriasis, he noted that she planned on starting Humira.  *Id.*

On March 25, 2021, Laudenslager also underwent chest x-rays, which did not provide any evidence of acute cardiopulmonary disease.  (Tr. 369).

7

On April 12, 2021, Laudenslager saw Dr. Cairns regarding a wart on her thumb and her eczema. (Tr. 380).  Dr. Cairns noted that her eczema had improved, and that Laudenslager had had no problems with the prior injection for her wart. *Id.*  A review of her systems and physical examination were largely unremarkable; Dr. Cairns noted that Laudenslager's dermatitis appeared to have resolved on her right thumb, but she had a persistent wart. (Tr. 382).  Dr. Cairns continued her medication and provided another injection for the wart. *Id.*

On May 11, 2021, Laudenslager saw Dr. Cairns regarding roughness on her feet and a wart. (Tr. 457).  On physical examination, Dr. Cairns noted she had a persistent wart and moderate xerosis with a few fissures on the soles of her feet. (Tr. 459).  Dr. Cairns provided an antigen injection and recommended at-home treatments for her feet. *Id.*

On May 11, 2021, Laudenslager also saw her chiropractor, Brian Griffin, D.C. (Tr. 472-474).  Laudenslager reported intermittent dull, aching pain in her cervical spine, which she rated as 3/10; intermittent aching pain in her mid-thoracic spine, which she rated as 3/10; frequent aching, throbbing, and sharp pain in her upper lumbar spine, including stiffness, which she rated as 7/10. (Tr. 472).  She also reported that her lumbar pain was aggravated by moderate activity, bending, lifting, and prolonged standing. *Id.*  Dr. Griffin noted that in her lumbar area, Laudenslager had paraspinal muscle guarding, prominence, rigidity, and tenderness bilaterally. *Id.*  He noted that Laudenslager's current status was "somewhat worse," and that she had progressed as expected. *Id.*  Dr. Griffin assessed Laudenslager with cervicalgia, segmental and somatic dysfunction across all regions of her spine, pain in the thoracic spine, and low back pain. (Tr. 473).  He instructed Laudenslager to use ice at home. *Id.*

On May 20, 2021, Laudenslager saw Dr. Antonchak, reporting that her hip, hand, and lower back pain had improved since starting Humira and starting injections. (Tr. 421-427).  A

review of Laudenslager's systems was positive for fatigue, dry mouth, dry eyes, diarrhea, memory difficulty, back pain, joint pain, joint swelling, morning stiffness, and weakness. (Tr. 425-426).  On physical examination, Dr. Antonchak observed that Laudenslager was overweight, and had tenderness in her lumbar spine, hips, and right knee, and noted that she had scattered myofascial tenderness.  (Tr. 426).  Dr. Antonchak's assessments remained unchanged, and he largely continued her medications.  (Tr. 421-422).

On May 24, June 16, June 21, June 30, July 20, and July 23, 2021, Laudenslager saw Dr. Griffin and reported the same complaints, rating her cervical pain as 3/10, her mid-thoracic pain as 3 to 5/10, her lumbar pain as 4 to 5/10, and her sacroiliac ("SI") joint pain as 4 to 6/10. (Tr. 475, 478, 481, 484, 487, 490).  During each visit, Dr. Griffin noted that Laudenslager's lumbar region had paraspinal muscle guarding, prominent, rigidity, and tenderness bilaterally. *Id.*  Dr. Griffin indicated she was somewhat worse, demonstrated no change, or was slightly improved but was progressing as expected, maintaining his diagnoses and treatment plan. (Tr.475-476, 479, 482, 484-485, 488, 491).

On July 28, 2021, Laudenslager saw Devol and reported improvement in her peripheral joints with Humira, but continued lower back and hip pain and increased upper back and neck pain.  (Tr. 414-419).  She denied nocturnal back pain but reported stiffness in the morning and changes to her pain as the day progressed, noting her pain worsened with walking.  (Tr. 416). She also noted having right-sided lower back pain.  *Id.*  On physical examination, Devol observed that Laudenslager was overweight, had tenderness across her spine, in both hips, and in her right knee, noting she had scattered myofascial tenderness.  (Tr. 419).  Devol assessed Laudenslager with what was "likely psoriatic arthritis" and continued her medication.  (Tr. 414). Devol also assessed Laudenslager with fibromyalgia, back pain, and psoriasis, which was flaring,

and Devol continued Laudenslager's current treatments and ordered x-rays of her back. (Tr. 415).  The x-rays of Laudenslager's back were unremarkable.  (Tr. 430-431).  Devol also provided Laudenslager pain relief injections for her fibromyalgia.  (Tr. 419).

On August 5, 2021, Laudenslager saw Dr. Griffin and reported the same complaints, rating her cervical pain as 3/10, her mid-thoracic pain as 3/10, her lumbar pain as 3/10, and her SI joint pain as 4/10.  (Tr. 493).  Dr. Griffin noted that Laudenslager's lumbar region had paraspinal muscle guarding, prominence, rigidity, and tenderness bilaterally.  *Id.*  Dr. Griffin indicated she showed slight improvement and was progressing as expected, maintaining his diagnoses and treatment plan.  (Tr. 493-494).

On August 11, 2021, Laudenslager saw Dr. Ray, complaining of a rash.  (Tr. 449). Laudenslager reported itching and a skin rash that had developed two weeks prior on her hands and abdomen and had spread to other parts of her body.  *Id.*  A review of her systems was consistent with her complaints.  (Tr. 450-451).  On physical examination, Dr. Ray observed that that Laudenslager had a vesicular-type rash on her abdomen and left wrist.  (Tr. 451).  Dr. Ray assessed her with contact dermatitis and provided her medication.  (Tr. 451-452).

On August 12 and 17, 2021, Laudenslager saw Dr. Griffin and reported the same complaints, rating her cervical pain as 3/10, her mid-thoracic pain as 3 to 5/10, her lumbar pain as 3 to 5/10, and her SI joint pain as 5 to 6/10.  (Tr. 496, 499).  Dr. Griffin noted that Laudenslager's lumbar region had paraspinal muscle guarding, prominence, rigidity, and tenderness bilaterally.  *Id.*  During both visits, Dr. Griffin indicated she was somewhat worse but had a good prognosis, maintaining his diagnoses and treatment plan.  (Tr. 496-497, 499-500).

On August 24, 2021, Laudenslager saw Dr. Ray regarding weight loss, nausea, and abdominal pain.  (Tr. 446).  Laudenslager reported having had nausea and stomach pain for the

previous five days, noting they were of moderate severity.  *Id.*  A review of Laudenslager's

systems was consistent with her complaints, and Dr. Ray's physical examination was

unremarkable. (Tr. 448).

On August 25, 2021, Laudenslager saw Devol.  (Tr. 407-412).  Laudenslager reported

that Dr. Ray had switched one of her medications, and the changed seemed to help her back pain,

but she still had right SI joint and hip pain.  (Tr. 409).  Overall, she indicated that she had

improvement in her peripheral joint symptoms since starting Humira, but some joint pain and

stiffness remained.  *Id.*  As to Laudenslager's likely psoriatic arthritis, Devol continued her

medication.  (Tr. 407).  Devol also assessed Laudenslager with fibromyalgia, back pain, and

psoriasis, which she continued Laudenslager's current treatments for.  (Tr. 408).

On August 30, September 7, and October 8, 2021, Laudenslager saw Dr. Griffin and

reported the same complaints, rating her cervical pain as 3 to 4/10, her mid-thoracic pain as 3/10,

her lumbar pain as 3/10, and her SI joint pain as 4 to 5/10.  (Tr. 502, 505, 508).  Dr. Griffin noted

that Laudenslager's lumbar region had paraspinal muscle guarding, prominence, rigidity, and

tenderness bilaterally.  *Id.*  Dr. Griffin indicated she showed slight improvement or was

somewhat worse, but had a good prognosis, maintaining his diagnoses and treatment plan.

(Tr. 502-503, 505-506, 508-509).

On October 12, 2021, Laudenslager saw Dr. Antonchak.  (Tr. 434-439).  Laudenslager

reported that she had not been doing well, but she thought her weekly Humira injections helped.

(Tr. 436).  She also noted a cyst on her right hand, and that she was under more stress with her

foster children.  *Id.*  On physical examination, Dr. Antonchak noted that Laudenslager was

crying but consolable, overweight, and had tenderness in her right hip and thoracic and lumbar

11

spine.  (Tr. 439).  Dr. Antonchak's assessments remained the same, as did his treatment, and he provided Laudenslager an injection.  (Tr. 434-435, 439).

### C.  Relevant Opinion Evidence

#### 1.  Letter – Brian S. Griffin, D.C.

On December 4, 2020, Dr. Griffin provided a letter describing his treating relationship with Laudenslager, indicating he had treated her for three years and she was diagnosed with "autoimmune arthritis."  (Tr. 301).  He stated that, since September 1, 2020, he had seen Laudenslager four times with "results being mixed."  *Id.*  He indicated that she seemed to respond to adjustments, but only for short periods; and "[h]er symptoms [were] also very up and down and [went] through periods of flare ups and remission."  *Id.*  In his opinion, it would be "very difficult for Lacey to work any type of physical job."  *Id.*  Dr. Griffin attached reports from his treatment of Laudenslager, indicating her functional level, status since her last visit, and areas of her spine that had spasms or "asy/fixation."  (*See* Tr. 302-304).

#### 2.  State Disability Assessment – Don McIntire, Ph.D.

On February 2, 2021, Don McIntire, Ph.D., evaluated Laudenslager's mental health.  (Tr. 314-322).  Laudenslager reported that she was applying for disability because of her fibromyalgia, psoriatic arthritis, and rheumatoid arthritis, and provided information on her "rough" upbringing with various form of abuse, her educational background, and her prior work history.  (Tr. 315-316).  Laudenslager reported that she had never been to counseling as an adult, nor had she taken psychiatric medications for emotional difficulties, although she noted Cymbalta helped with her depressive symptoms to some extent.  (Tr. 317).  Laudenslager indicated she had nightmares and night sweats, which she related to her past abuse, and she had difficulties with memory and concentration.  (Tr. 318).

Dr. McIntire conducted a mental status examination and made the following observations.  Laudenslager was appropriately groomed, pleasant, cooperative, alert, and focused; and she had normal speech, congruent affect, no outward signs of anxiety, organized and logical thoughts, tight associations, good memory, average intellectual ability, and intact judgment.  (Tr. 318-320).  He also noted that she appeared to have good gross and fine motor skills, but exhibited pain behavior with postural shifts.  (Tr. 318-319).  He indicated that she may have underestimated her perception of her verbal comprehension, memory, and math skills in light of her performance during the examination.  (Tr. 320).  Dr. McIntire assessed Laudenslager with Other Specified Trauma and Stressor-Related Disorder.  (Tr. 322).

Dr. McIntire concluded that Laudenslager had a good ability to understand, remember, and follow basic instructions and a good ability to maintain attention and concentration on simple, repetitive tasks.  (Tr. 322).  Laudenslager also had a good ability to perform more complicated tasks and get along with coworkers.  *Id.*  Dr. McIntire found she also had a good ability to manage everyday work stress, noting her reported memory difficulties could be due to pain, medications, or adjustment to the lack of schedule when not working.  *Id.*

### 3.      Medical Source Statement – Candice Devol, P.A.

On November 11, 2021, physician assistant Candice Devol completed a medical source statement regarding Laudenslager's arthritis.  (Tr. 518-521).  She reported that she started seeing Laudenslager in October 2018 and had continued to see her every 1 to 6 months.  (Tr. 518).  Laudenslager was diagnosed with fibromyalgia and psoriatic/rheumatoid arthritis.  *Id.*  Devol noted that Laudenslager's prognosis was good, but they were still adjusting her medications.  *Id.*  She described Laudenslager's condition as affecting various joints, causing swelling and pain with any range of motion.  *Id.*  She identified impaired sleep, impaired appetite, trigger points,

13

and muscle spasms as positive objective signs.  *Id*  Devol also indicated that emotional factors impacted Laudenslager's symptoms and functional limitations, specifically her depression and anxiety.  (Tr. 518, 520).  Devol noted that Laudenslager's medication may cause drowsiness, dizziness, and a gastrointestinal upset.  (Tr. 520).  Laudenslager's impairments could be expected to last at least 12 months.  *Id.*  Devol did not complete the rest of statement.  (*See* Tr. 519-521).

### 4.  State Agency Consultants

On January 6, 2021, Dana Schultz, M.D., reviewed the medical evidence in support of Laudenslager's RFC.  (Tr. 79-80).  She concluded that Laudenslager was limited to: (i) occasionally lifting and/or carrying 20 pounds; (ii) frequently lifting and/or carrying 10 pounds; (iii) standing and/or walking for 6 hours in an 8-hour workday; and (iv) siting for 6 hours in an 8-hour workday.  (Tr. 79).  She also found the following postural limitations, Laudenslager could: (i) frequently climb ramps and stairs; (ii) balance, stoop, and crouch in an unlimited manner; and (iii) never climb ladders, ropes, or scaffolds, kneel, or crawl.  *Id.* Dr. Schultz did not find any other limitations, except that Laudenslager should avoid all exposure to hazards.  (Tr. 80).  On June 4, 2021, Abraham Mikalov, M.D., reconsidered the medical evidence of Laudenslager's RFC and affirmed Dr. Schultz's findings.  (Tr. 88-89).

### 5.  Function Report – Lacey Laudenslager

On December 12, 2020, Laudenslager completed a report on her functioning. (Tr. 212-219).  She described how her fingers and wrists would be in pain, swell, tingle, and be numb.  (Tr. 212).  She indicated that this caused her to frequently drop things, have pain when writing or typing, and have trouble with fine motor skills.  *Id*.  Due to the swelling and a knee injury, she also reported that it hurt to stand, walk, or run, and she stated she had been advised not to overly use her knee.  *Id.*  She reported having a mental fog, which caused her trouble

staying on task or following multi-step tasks.  *Id.*  Her hips and back also hurt daily, but rest improved the pain.  *Id.*

Laudenslager described her day as follows.  (Tr. 213). She would get up with her daughter, pick up things in short bursts, sit on the couch, and try to complete a goal she set each day.  *Id.*  She started each day by relaxing her back and joints by icing them, and she would make dinner, relax, and go to bed.  *Id.*  She would care for her two-and-a-half-year-old daughter and her four dogs, but her dogs had an automatic feeder and waterer, and access to their run.  *Id.* Her husband would help lift anything over 15 pounds, and help her dress, cook, and clean when she should not.  *Id.*  Because of the limitations caused by her conditions, Laudenslager indicated she had had to stop work, caring for her home as much, participating in her hobbies, and working out.  *Id.*  Her conditions also caused her insomnia and fatigue.  *Id.*

Regarding her personal care, Laudenslager reported that she would ask her husband for help with putting on her bra, socks, shoes, etc., and she could care for herself, but adjusted, such as only shaving once a week on good days and keeping her hair short and low maintenance.  *Id.* She did not need reminders for her personal care, but did for her medicine, using organized pill cases and a digital assistant to remind her of things.  (Tr. 214).  She could prepare simple meals that took 20 minutes or less, and sandwiches, cereal, or snacks, and did so daily.  *Id.*  If she cooked dinner, she would take breaks and sit down more.  *Id.*  She would do some household chores, such as loading the dishwasher or folding laundry, but she could only do about one task a day and she would get too worn out to finish them or the petition would hurt and fatigue her hands and arms.  *Id.*  She did not go outside because the cold made her body hurt, and her hip hurt if she walked too far.  (Tr. 215).  She would drive or ride in a car, and used a scooter in

stores. *Id.* She would go grocery shopping, and have the clerks assist her in loading purchases into the car; she would go once or twice a week for about 20 to 30 minutes. *Id.*

Regarding her hobbies, Laudenslager reported that she watched TV, did social media, played on her phone, crafted, and gardened. (Tr. 216). She would garden during the spring/summer, do crafting about once a week, and did her other hobbies every day. *Id.* She would spend time with others either in-person, over the phone, texting, or video chatting. *Id.* She only went to the grocery store regularly and she did not really go out otherwise because it was easier to stay home. *Id.* She did not have any problems getting along with others and indicated that she used to interact with hundreds of people at her job, but she quit because of her conditions. *Id.* Her conditions also affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember things, complete tasks, concentrate, understand, follow instructions, and use her hands. (Tr. 217). She estimated that she could lift 15 to 20 pounds, could squat with only one knee, and struggled to stand up, her back hurt while bending, standing, or reaching, and she could walk about 3/4 of a mile. *Id.* She also indicated that kneeling hurt her knee, that walking and sitting hurt her hips, that she would get winded after one flight of stairs, and that she was slower with cognitive tasks and would stop and forget tasks. *Id.* She indicated she could walk a quarter to a half a mile before needing to stop and rest for a few minutes, and she could pay attention for 15 to 20 minutes before being distracted by pain. *Id.* She could follow written instructions well, but she would forget spoken instructions. *Id.* She did not have any issues with authority. *Id.* Laudenslager's ability to handle stress depended on how she felt physically, she handled changes to her routine poorly, and she now had confusion, memory loss, and stuttering/loss of words that she did not before. (Tr. 218). She indicated she used a cane, brace, and a hand tool/grabber. *Id.*

16

### D.    Relevant Testimonial Evidence

Laudenslager testified at the hearing.  (Tr. 44-66).  She lived with her husband, daughter, and two foster children.  (Tr. 44).  She indicated that she struggled to go up and down the stairs and she cared for her three children, who were ages 3 and a half and twin 11-month-olds. (Tr. 44-45).  Her sister or mother-in-law would occasionally come over and help her with the children, about once or twice a week.  (Tr. 62).  She would usually ask for help when she felt like she was getting behind on household chores.  *Id.*  She would drive herself short distances (about 30 minutes), but her back would start hurting and it was too exhausting to drive longer distances. (Tr. 45-46).  She would occasionally drive to Columbus, which was an hour and a half away. (Tr. 46).  She could sometimes take care of her personal hygiene, but on days where her pain was worse, she would need her husband's assistance.  *Id.*

Laudenslager testified that she had last worked on September 1, 2020 as a corrections officer, and she had stopped because it was too strenuous on her body.  *Id.*  In that position, she would have to lift up to the weight of a person, and would be on her feet for almost the entire shift.  (Tr. 47).  She had also previously worked for a residential program for the developmentally disabled, investigating things like assaults against residents.  (Tr. 47-48).  She did not think she needed to lift more than about 20 pounds, or a copy box, and her job was mostly seated.  (Tr. 48-49).  She also worked caring for the animals at the humane society, and as a dog catcher, which required her to lift about a 100-pound dog and was completely done while standing.  (Tr. 49-50).  She worked as a gas station attendant, which required her to lift about 20 pounds a day and to be on her feet for the entire shift.  (Tr. 50). She worked as a car sales person and client retention specialist, which did not require her to lift anything and was primarily sitting. (Tr. 50-51).  Lastly, she worked for a company that provided care for elderly individuals and

17

individuals with specialist needs, where she would occasionally need to help lift the individual to move them and spent most of her time on her feet. (Tr. 52). She also worked as a receptionist, which required her to lift about 20 pounds and was mostly seated. (Tr. 53).

Laudenslager testified that she believed she could not work because she struggled with autoimmune arthritis, severe pain in her spine and particularly her mid to lower back; arthritis in her hands; and pain in her shoulders, elbows, hips, and knees. (Tr. 54-55). She also had rheumatoid arthritis, psoriatic arthritis, and fibromyalgia, and memory issues, although she was not sure of the cause. (Tr. 55). In terms of side effects, she indicated that Humira and her muscle relaxers caused her to be carsick, and others caused to her have severe fatigue and tiredness. (Tr. 55-56). She estimated that she could stand for about 30 minutes on a good day and 10 minutes on a bad day, and she could walk for a block or two on a good day and "much less" on a bad one. (Tr. 56). She could sit for about an hour and could lift about a gallon of milk on a bad day and about 25 pounds on a good day. *Id.*

Laudenslager described her typical day as follows. *Id.* She would get up, get her kids up, dressed, downstairs and fed; sit on the couch; and maybe complete a task. (Tr. 56-57). She did not really play with her kids or do any of the grocery shopping. (Tr. 57-58). If it was a good day, she may go grocery shopping. (Tr. 58). She would have a friend or family over once or twice a month, and they would sit and talk. *Id.* She liked to crochet and make jewelry as a hobby, and would sell things on garage sale sites or a local market. (Tr. 58-59). She noted that she had three small dogs and was on Facebook. (Tr. 60). She would also play games on Facebook. (Tr. 60-61). She did not think she could do a job where she sat and sorted nuts and bolts, because for the amount of time sitting her spine and shoulders would begin to hurt. (Tr. 61). She could not do household chores, such as laundry, because she could not lift, and

18

repetitive tasks, such as loading the dishwasher, were "extremely difficult."  (Tr. 62-63).  She

explained that she really only picked up her children when getting them out of bed in the

morning, if she changed them she did so on the ground, and she only prepared basic food.

(Tr. 63).  She estimated that her husband did 90% or more of the housework.  *Id.*  Laudenslager

also testified that her hands and joints hurt when pressure was applied, so she could not open

jars.  (Tr. 64).  She also had trouble with her dexterity and holding fine objects.  *Id.*  She noted

she had not crocheted in three to four months because her fingers would go numb.  (Tr. 64-65).

When she could do it, she could do it for about 30 minutes before her fingers when numb.

(Tr. 65).  She explained that all of her activities were slow now because she did not want to hurt

herself.  *Id.*  She used a cane, but not due to a doctor's recommendation or prescription.

(Tr. 65-66).  She estimated that she used the cane for one full day about once a week.  (Tr. 66).

Laudenslager thought she was having more bad days than good, even with the increased

medication.  *Id.*

III.     **Law & Analysis**

        A.      **Standard of Review**

        The court's review of the Commissioner's final decision denying disability benefits is

limited to deciding "whether the ALJ applied the correct legal standards and whether the findings

of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the

relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks

omitted), even if a preponderance of the evidence might support the opposite conclusion,

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's

decision will not be upheld when the ALJ failed to apply proper legal standards and the legal

error prejudiced the claimant.  *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

> ### B.      Step Two: Severe Impairment Analysis

Laudenslager contends that the ALJ erred by failing to find that her fibromyalgia and psychological disorders constituted severe impairments.  ECF Doc. 9 at 9-10.  The Commissioner disagrees, contending that the ALJ complied with the regulations and, even if not, any error would be harmless.  ECF Doc. 12 at 12-14.  In her reply brief, Laudenslager largely reiterates her argument.  ECF Doc. 13 at 1-2.

At Step Two of the sequential evaluation process, a claimant has the burden to show that she has *at least one* "severe impairment."  20 C.F.R. § 404.1520(a)(4)(ii), (c).  A "severe impairment" is a medical condition that has more than minimal effect on mental or physical function and is expected to last for 12 months or cause death.  20 C.F.R. §§ 404.1509, 404.1522; *Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985).  This is a threshold inquiry "intended to 'screen out totally groundless claims.'"  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).  If the claimant doesn't show she has *at least one* "severe" impairment, she's categorically *not* disabled.  20 C.F.R. § 404.1520(c).  If she does satisfy this minimal burden, the ALJ has to consider *all of her impairments* (even ones that aren't "severe") at the remaining steps in the sequential evaluation.  *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 1996 SSR LEXIS 5 (Jul. 2, 1996)).  And, so long as the ALJ considers all the claimant's

impairments in the other steps, any Step Two error is harmless.  *Nejat*, 359 F. App'x at 577

(citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

As to fibromyalgia specifically, the Sixth Circuit has held that it may be a "severe

impairment," but its evaluation presents challenges because the disease has no known cause or

cure.  *Herzog v. Comm'r of Soc. Sec.*, No. 2:16-CV-244, 2017 U.S. Dist. LEXIS 82965, at *18

(S.D. Ohio May 31, 2017) (citing *Preson v. Sec'y of Health and Human Servs.*, 854 F.2d 815,

818 (6th Cir. 1988)).

The ALJ applied the correct legal standard and reached a decision supported by

substantial evidence, or harmlessly erred in doing so, in determining that Laudenslager's

fibromyalgia and psychological impairments were not severe.  42 U.S.C. § 405(g); *Blakely*, 581

F.3d at 405.  First, as to her psychological impairments, nothing in the record supports

Laudenslager's contention that her psychological impairments met the requirements to constitute

"severe" impairments.  The medical record contains almost no evidence of any psychological

impairments; it has no mental health treatment records, few if any mental health complaints; and,

what few indications of mental health conditions do exist, there is no indication of their severity

or functional impacts.  Consequently, the ALJ would have had no basis on which to find that

substantial evidence supported the conclusion that Laudenslager's briefly reported depression

and anxiety (i) were significant enough to last for a year, or (ii) would cause more than a

minimal impairment to her functioning.  My independent review of the record yielded the same

conclusion.  The ALJ did not err in finding that Laudenslager's mental impairments were not

severe.  *See* 20 C.F.R. §§ 404.1509, 404.1522.

Because of the troublesome nature of fibromyalgia, determining whether the ALJ erred in

failing to find it a severe impairment is a closer question.  However, even assuming an error by

the ALJ, such an error would be harmless in light of the ALJ's subsequent consideration and discussion of Laudenslager's joint and body pain.  *Nejat*, 359 F. App'x at 577.  The ALJ summarized Laudenslager's complaints, noting her fibromyalgia complaints.  (Tr. 22-23).  The ALJ also summarized numerous notes from Devol and Dr. Antonchak of the Columbus Arthritis Center, all of which discussed Laudenslager's fibromyalgia.  (*See* Tr. 24-26, citing Tr. 258-260, 263-264, 267, 358-360, 421-423, 426, 434, 465).  And throughout these summaries, the ALJ routinely acknowledged Laudenslager's reported pain, examination results, limited range of motion, and stiffness, tenderness, and/or swelling.  (*See* Tr. 24-26).  Based on this discussion, any error by the ALJ in failing to find Laudenslager's fibromyalgia to be a "severe impairment" was harmless because the ALJ's decision demonstrates that she considered Laudenslager's condition and underlying symptoms.  *Nejat*, 359 F. App'x at 577.  I recommend that the ALJ's decision be affirmed on this ground.

### C.    Step Four: Medical Opinions

Laudenslager contends that the ALJ erred in finding the opinion of PA Devol unpersuasive because the ALJ's discussion failed to discuss both the supportability and consistency criteria required to be considered under the regulations.  ECF Doc. 9 at 10-15.  Laudenslager's argument also mentions the ALJ's consideration of Dr. Davidson's opinion.  ECF Doc. 9 at 14.  The Commissioner disagrees.  ECF Doc. 13 at 14-18.  Laudenslager's reply brief only gave this issue a passing mention.  *See* ECF Doc. 13 at 2.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e).  In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must

explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2)[3].  According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

As a preliminary matter, it is unclear from Laudenslager's merits brief whether she intended to argue that the ALJ erred in the evaluation of Dr. Davidson's opinion or whether the reference to Dr. Davidson was as supporting evidence for her contention that the ALJ erred the evaluation of Devol's opinion.  The Commissioner identified this ambiguity, but Laudenslager's reply brief did not address the concern.  *See* ECF Doc. 12 at 17; ECF Doc. 13.  In her merits brief, Laudenslager did not address any portion of the ALJ's analysis of Dr. Davidson's opinion, but simply stated that "[t]he probative value of this evaluation was that is demonstrated that Plaintiff had problems with her knee, problems which should have resulted in a finding that she had a severe impairment."  ECF Doc. 9 at 14.  At best, Laudenslager contends that the "ALJ also claimed that she also considered an opinion from Dr. James Davidson."  ECF Doc. 9 at 14.  This, however, is insufficient to constitute an argument capable of being reviewed.  *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) ("[issues] adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived."

---

[3] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

(Internal quotation marks omitted)).  Because Laudenslager has focused on the substance of Dr. Davidson's opinion rather than on the ALJ's treatment of it, I find it unreasonable to treat Laudenslager's single paragraph as sufficient to raise a challenge to the ALJ's treatment of Dr. Davidson's opinion.  Laudenslager has waived any argument on that issue.

As to Devol's opinion, the ALJ applied the correct legal standards, or harmlessly erred in doing so, and reached a decision supported by substantial evidence in finding Devol's opinion not persuasive.  *See Blakely*, 581 F.3d at 405.  First, it is important to note that it is questionable whether Devol's "opinion" even constitutes a medical opinion under the regulations.  The regulations define a medical opinion as a statement from an acceptable medical source that describes "what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).  Devol's arthritis medical source statement did not opine on Laudenslager's remaining functional capabilities.  (Tr. 518-521).

Nevertheless, even treating the statement as a medical opinion, the ALJ met her obligations under 20 C.F.R. § 404.1520c(c) by identifying and discussing the support for Devol's opinion and any inconsistencies with the other medical evidence.  (Tr. 27-28).  Although the ALJ did not frame her analysis with the regulatory words "supportability" and "consistency," when we read the decision as a whole and with common sense, the ALJ's reasoning as to those factors is clear.  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").  The ALJ identified that Devol's opinion lacked examples of how Laudenslager's anxiety and depression contributed to the severity of her symptoms and noted that her opinion was inconsistent with various rheumatology records.  (Tr. 27-28).  And the ALJ specifically found that "Ms. Devol's own objective examinations do not support her opinion."  (Tr. 28).  Further, the ALJ cited records

from Laudenslager's visits with Devol at the Columbus Arthritis Center in her discussoin of the medical evidence. (Tr. 25-26). This analysis satisfied both the supportability and consistency requirements under the regulations. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Moreover, the ALJ's analysis was supported by substantial evidence. Such evidence includes: (i) Dr. McIntire's evaluation that Laudenslager had no mental health impairments (Tr. 322); (ii) the lack of treatment notes identifying any mental health concerns; (iii) the lack of any mental health treatment records generally; and (iv) treatment notes identifying that Laudenslager was fully oriented, had a normal memory, had an appropriate affect and mood, and had good insight and judgment (*see* Tr. 267, 341, 412, 419, 426, 439). In light of Dr. McIntire's evaluation and the lack of the evidence supporting mental health limitations, the ALJ reasonably concluded that Devol's opinion that Laudenslager's anxiety and depression contributed to her symptoms was unpersuasive – because there was no medical evidence of anxiety and depression. *See Blakely*, 581 F.3d at 406. Accordingly, remand is not warranted based on the ALJ's treatment of Devol's opinion.

### D.    Step Four: Subjective Symptom Complaints

Laudenslager contends that the ALJ erred in evaluating her subjective symptom complaints by failing to provide sufficient explanation for her decision and reaching a finding that was not supported by substantial evidence. ECF Doc. 9 at 15-20. Within this portion of her argument, Laudenslager makes passing assertions that the ALJ erred in failing to find the combination of her impairments disabling and in failing to find any limitations related to her fatigue. ECF Doc. 9 at 18-19. The Commissioner disagrees. ECF Doc. 12 at 18-21. Laudenslager's reply brief did not address this issue. *See* ECF Doc. 13 at 2.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in determining a claimant's RFC at Step Four.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  Generally, an ALJ must explain whether she finds the claimant's subjective complaints consistent with objective medical evidence and other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for discounting subjective complaints).  In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate her symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

The ALJ applied the correct legal standards and reached a decision supported by substantial evidence in finding Laudenslager's subjective symptom complaints inconsistent with

26

the record.  *See* 42 U.S.C. § 405(g); *Blakely*, 581 F.3d at 405.  The ALJ acknowledged her

obligation under SSR 16-3p in the review of Laudenslager's subjective complaints, and

specifically mentioned many of the factors.  (*See* Tr. 22-23).  The ALJ also reviewed

Laudenslager's complaints interspersed with her review of the medical evidence.  (*See*

Tr. 22-26).  Reading the ALJ's analysis with common sense, the ALJ made sufficient findings

and adequately articulated her reasons for rejecting Laudenslager's complaints.  *See Buckhanon*

*ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2020) ("[The court] read[s] the ALJ's

decision as a whole and with common sense.").  In summarizing the evidence, the ALJ identified

that Laudenslager had repeatedly reported improvement in her conditions with changes in her

medication; treatment notes indicated she minimal tenderness or difficulty moving; and

Laudenslager reported, and doctors observed, minimal psoriasis.  (Tr. 23-26).  All of which, the

ALJ noted, was in contrast to the severity of Laudenslager's complaints and claims to the doctors

of debilitating pain.  *Id.*  In light of this discussion and explanation of the ALJ's reasoning, the

ALJ fully satisfied her articulation obligation under the regulations.  SSR 16-3p, 2016 SSR

LEXIS 4 *15; 20 C.F.R. § 404.1529(c)(3); *Renstrom*, 680 F.3d at 1067.

Specifically, as to Laudenslager's fatigue complaints, she contends that "[t]hroughout her

treatment, [she] complained of fatigue to her treating sources," and then asserts that the ALJ

erred when she "ignored relevant medical evidence documenting Laudenslager's fatigue."  ECF

Doc. 9 at 19.  However, Laudenslager has failed to identify any objective medical evidence –

citing only her own reported complaints – which supported her alleged fatigue.  *See* ECF Doc. 9.

And my independent review of the record did not locate any references that were not attributable

to Laudenslager's own reports.

Further, independent review of the record does show that the ALJ's conclusions were supported by substantial evidence. Such evidence includes: (i) the lack of objective tests or treatment notes identifying fatigue; (ii) treatment notes indicated Laudenslager's pain improved with medication, (*see* Tr. 258, 260, 265, 294, 338, 343, 345, 348-352, 353-357, 409, 414-419, 421-427, 436); (iii) Laudenslager's conservative treatment history; and (iv) Devol's assessment that Laudenslager had fibromyalgia and prosaic/rheumatoid arthritis, without indication of fatigue (*see* Tr. 518-521). *See Blakely*, 581 F.3d at 406. And, even if had been some objective evidence in support of Laudenslager's fatigue claims, such would not undermine the ALJ's reasons for finding her other subjective complaints inconsistent with the medical evidence. *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result." (citations omitted)). Based on this evidence, the ALJ's decision was supported by substantial evidence and fell within her "zone of choice;" accordingly, it should be affirmed. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

### E. Step Four: Light Work/Past Work

Laudenslager contends that the ALJ erred in concluding that she could perform light work and perform her past work, which were skilled or semi-skilled positions. ECF Doc. 9 at 21-23. The Commissioner disagrees. ECF Doc. 12 at 22-23. Laudenslager's reply brief did not address this issue. *See* ECF Doc. 13.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite her

impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R.
§ 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the
[ALJ] must consider limitations and restrictions imposed by all of an individual's impairments,
even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a
claimant's medical history, medical signs, laboratory findings, and statements about how the
symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996
SSR LEXIS 5.

> Light work is defined under the regulations as:
>
> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds. Even though the weight lifted may be very little,
> a job is in this category when it requires a good deal of walking to standing, or when
> it involves sitting most of the time with some pushing and pulling of arms or leg
> controls. To be considered capable of performing a full or wide range of light work,
> you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

Additionally, at Step Four, the claimant has the burden to establish that she is unable to
perform her past relevant work in light of her RFC. 20 C.F.R. § 404.1520(a)(4)(iv); *see also*
*Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (explaining that a
claimant challenging a finding that she was able to perform past relevant work had "fail[ed] to
provide [court] with the factual record [the court] need[ed] to find in her favor"). In
evaluating whether a claimant is able to perform her past work, an ALJ: (1) will ask the claimant
for information about the past work (duties, requirements, etc.); and (2) may consult other
sources, such as VE testimony or the DOT. 20 C.F.R. § 404.1560(b); *see also* SSR 00-4p, 2000
SSR LEXIS 8, at *4 (Dec. 4, 2000) ("We may also use VEs and VSs at these steps to resolve
complex vocational issues.").

The ALJ applied the correct legal standards and reached a conclusion supported by substantial evidence in finding that Laudenslager could perform light work and, therefore, could perform some of her past work  *See Blakely*, 581 F.3d at 405.  Although Laudenslager presents her argument as being in regard to her past work, the real thrust of her argument challenges the ALJ's finding that she could perform work at the light exertional level – specifically, that she could use her hands to the extent necessary.  *See* ECF Doc. 9 at 21-23.  Notably, she has not alleged that the ALJ or VE made any error in evaluating her past work or the jobs' various functional requirements.  *See generally* ECF Doc. 9.  Laudenslager's argument regarding light work forms the linchpin of her remaining contentions because, if she cannot lift the required amount due to her hands, and can only occasionally handle, finger, and feel, then "[t]hat limitation would preclude all work" (Tr. 22) and, in passing, she asserts that her absenteeism would eliminate all work and her psychological symptoms would eliminate all skilled or semi-skilled work.  *See* ECF Doc. 9 at 22-23.

Laudenslager has not cited any specific evidence that the ALJ failed to address, which would directly undermine the ALJ's finding that Laudenslager could work at the light exertional level.  *See* ECF Doc. 9 at 21-23.  Laudenslager points to a number of records related to her hands that *could* support a greater limitation than that found by the ALJ.  But even if a preponderance of evidence exists from which the ALJ *could* have reached a different conclusion, once it has been determined that substantial evidence supports the ALJ's evaluation, the ALJ's decision cannot be rejected.  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  And the ALJ's decision demonstrates that she considered Laudenslager's subjective complaints, the medical opinions, and the medical evidence.  (Tr. 22-29).

Moreover, substantial evidence supports the ALJ's conclusion that Laudenslager could occasionally perform handling, fingering, and manipulation at the light exertional level.  Such evidence includes: (i) treatment notes indicated Laudenslager's pain improved with medication, (*see* Tr. 258, 260, 265, 294, 338, 343, 345, 348-352, 353-357, 409, 414-419, 421-427, 436); (ii) a general lack of pain or limitations in her hands on examination (Tr. 283, 288-289, 298, 382, 384, 388, 396, 402, 419, 426, 439, 450-451, 459); and (iii) the state agency consultants did not identify any manipulative limitations (*see* Tr. 80, 88-89).  *See Blakely*, 581 F.3d at 406.

Finally, Laudenslager also made the passing contentions that the ALJ's RFC and past work findings were erroneous because "based on her psychological symptoms she was limited to unskilled work" and that the jobs the VE identified which would permit occasional manipulative limitations, would be limited if the individual was off task more than 10% of the day.  *See* ECF Doc. 9 at 22-23.  Laudenslager, however, provided no support for these assertions.  She provided no substantive support for her claim that she would be off task more than 10% of the day; and she has not provided evidentiary support for the claim that her alleged psychological symptoms limited her to unskilled work.  *See generally* ECF Doc. 9.  Laudenslager acknowledges it was her burden to disprove both of these limitations if she were to show that the ALJ's past work finding was wholly erroneous.  *See* ECF Doc. 9 at 22-23.  As discussed above, an independent review of the record revealed no medical evidence to support Laudenslager's alleged psychological symptoms.  And there is no medical evidence to support a finding that Laudenslager would be off task a work-preclusive amount of time.  Accordingly, because the ALJ's light work finding was supported by substantial evidence and, thus, did not undermine her past work finding, I recommend that the ALJ's RFC finding be affirmed.

## IV.     Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Laudenslager's application for DIB be affirmed.

Dated: September 12, 2023

Thomas M. Parker
United States Magistrate Judge

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, at *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).